170 So.2d 577 (1964)
RADIO TELEPHONE COMMUNICATIONS, INC., a Florida corporation, Petitioner,
v.
SOUTHEASTERN TELEPHONE COMPANY, a Florida corporation, and Florida Public Utilities Commission, an agency of the State of Florida, Respondents.
No. 32863.
Supreme Court of Florida.
April 3, 1964.
On Rehearing January 20, 1965.
Wilfred C. Varn, of Ervin, Pennington & Varn, Tallahassee, for petitioner.
D. Fred McMullen, of Ausley, Ausley, McMullen, O'Bryan, Michaels & McGehee, Tallahassee, for Southeastern Telephone Co.
*578 Lewis Petteway and B. Kenneth Gatlin, Tallahassee, for Florida Public Utilities Commission.
ROBERTS, Justice.
This cause is before the court on certiorari to review an order of the Florida Public Utilities Commission entered in a proceeding brought before the Commission by Radio Telephone Communications, Inc., petitioner here (referred to hereafter as "RTC"). The Southeastern Telephone Company ("Southeastern" hereafter) was named as a "defendant" in the Commission proceeding and is a respondent here.
The facts upon which the order here reviewed was based were stipulated by the parties and are, in substance, as follows:
Both Southeastern and RTC hold licenses designated "Radio Station License, Common Carrier" from the Federal Communications Commission ("FCC" hereafter) authorizing them to provide "Domestic Public Land Mobile Radio Service" from base stations and transmitters located in Tallahassee, Florida, to the mobile units of the subscribers to their respective services.
Southeastern holds a certificate of public convenience and necessity No. 33 from the Florida Public Utilities Commission (the "Florida Commission" hereafter) under the authority of which it has for many years provided landline telephone service  local exchange and toll  in Tallahassee and environs (and in other areas which need not be listed here). It operates its mobile radio service in connection with its telephone landline system which serves the City of Tallahassee and an area within a 20-mile radius of the city. A subscriber to its mobile radio service can engage in a two-way conversation from within or without Southeastern's Tallahassee exchange area with a person at a station on the exchange telephone facilities of Southeastern, and can also make toll calls to persons in other of Southeastern's exchanges. And the reverse of such two-way conversation can be and are carried on. (And, of course, a two-way conversation between subscribers by radio alone, may be carried on.) Southeastern has on file with the Florida Commission a General Tariff covering its landline telephone service, as well as a tariff covering its mobile radio service operated in connection therewith. It has not filed with FCC its tariff respecting its mobile radio service.
RTC applied to and was issued a license by FCC to operate a mobile radio service as a "miscellaneous common carrier"  defined in the FCC Rules and Regulations, Part 21, as a communications common carrier which is not engaged in the business of providing a public landline telephone service. 47 CFR 927. It is licensed to operate 100 mobile stations and is presently servicing more than 50 mobile units from its base station in Tallahassee. It is also licensed by FCC to operate in the Rural Subscriber Fixed Radio Service and is presently providing service to a half-dozen or more rural fixed stations, at least two of which are within a 20-mile radius of Tallahassee. It also provides a message-relay and a dispatch service for its subscribers. The radius of RTC's reliable service area from its base station in Tallahassee is in excess of 45 miles, extending into Georgia and Alabama and the Gulf of Mexico. RTC has on file with FCC a tariff covering its various radio services. It has not filed with the Florida Commission its tariff respecting such services, nor did it apply to such Commission for a certificate of public convenience and necessity prior to undertaking such services under its several FCC licenses.
RTC is a subscriber to the landline telephone facilities of Southeastern, having a single-party business telephone line allotted for its use. By means of such landline telephone, a recorder, and the radio facilities of RTC, subscribers to RTC's radio services (both mobile and rural-fixed) can communicate with persons at stations on Southeastern's landline telephone system, and vice versa. RTC made the "interconnection" between *579 its radio service and Southeastern's landline telephone system with the knowledge but without the consent of Southeastern. (RTC states that its "interconnected" service with Southeastern represents but a fraction of its total service rendered to its subscribers, but that most of them "desire interconnected service and many depend upon such interconnected services as an incident to the operation of their businesses.") It pays to Southeastern the regular General Tariff rate for a single-party business line and recorder connector and offered to pay a reasonable rate for the use of Southeastern's landline in the two-way communication between Southeastern's landline subscribers and RTC's radio-service subscribers referred to above. Southeastern declined the offer, advised RTC that the "interconnection" with its landline system was in violation of its General Tariff on file with the Florida Commission, and demanded that RTC cease such interconnection under penalty of having its single-party business telephone disconnected. Thus inspired, RTC commenced the litigation culminating in the certiorari proceeding in this court.
RTC first sought relief in the Circuit Court of Leon County, Florida, by filing suit to enjoin Southeastern from interfering with the telephone service then being provided by it to RTC. The Circuit Court entered a temporary injunction granting such relief but, at the same time, ordering RTC to apply to the Florida Commission "for the determination of its right, if any, to be furnished telephone service" by Southeastern.
Pursuant to such mandate, RTC filed with the Commission its "complaint", naming Southeastern as a party "defendant". The complaint alleged, inter alia, that FCC had pre-empted the field of radio service, and that to permit the disconnection of its telephone service by Southeastern would violate various constitutional rights of RTC and constitute a burden upon interstate commerce. It asked the Commission to determine the present right of RTC to continue to receive telephone service from Southeastern or, in the alternative, to establish the requirements that should be met by RTC to entitle it to receive such service.
In its answer Southeastern asserted that RTC's unauthorized interconnection of its radio services with Southeastern's landline violated Southeastern's tariff as well as the laws of Florida requiring the issuance by the Florida Commission of a certificate of public convenience and necessity as a prerequisite to the operation of any "telephone line, plant or system, or any extension thereof * * *." Sec. 364.33, Fla. Stat., F.S.A.
The Commission found that RTC "is operating a telephone line used in the conduct of the business of affording telephonic communication for hire within this state and that RTC is a telephone company under the laws of Florida", so that a certificate of public convenience and necessity was required for the operation being conducted by it. Its order authorized Southeastern to discontinue the connection of its telephone service with RTC's fixed and mobile radio service and denied the relief requested by RTC. This is the order brought here by RTC for review.
The parties have stated differently the questions before this court  but the decisive issue, of course, is whether RTC is a "telephone company" within the meaning of our statute, Chapter 364, Fla. Stat., F.S.A.
At the outset we think it would be well to dispose of RTC's contention that the regulation of radio broadcasting and communication, including the radio services with which we are here concerned, has been pre-empted by the federal government so that these radio services are not subject to state regulation and control. It is true that, in 1927, Congress began the regulation of the developing science of radio broadcasting and communication; and, in 1934, in the so-called Federal Communications Act of 1934, Title 47 U.S.C.A. § 151 et seq., formulated a unified and comprehensive regulatory system in this field, including a system of permits and licenses *580 to be granted or withheld by the Federal Communications Commission in accordance with the dictates of the public convenience, interest or necessity. As to certain communication services within the purview of the Act, however, viz. "wire, mobile, or point-to-point radio telephone exchange service, or any combination thereof", the Act expressly provides that the FCC should have no jurisdiction with respect to "charges, classifications, practices, services, facilities, or regulations for or in connection with [such services] in any case where such matters are subject to regulation by a State commission or by local governmental authority." Title 47, Sec. 221(b), U.S.C.A. These communications services are essentially intra-state in nature, even though the radio portion of such services might "spill over" into an adjoining state, since a radio signal cannot recognize nor stop at a state line; and it is clear that Congress intended to reserve to the several states the right to regulate such intra-state services in the manner specified in Section 221(b), supra. See Application of Souris River Telephone Mutual Aid Corporation (1960) 28 F.C.C. 275.
In the Souris River case, supra, the applicant applied to FCC for a construction permit and license to operate in the Domestic Public Land Mobile Radio Service (Two-way) in connection with its existing telephone landline system, which had been duly certificated by the Public Service Commission of the State of North Dakota. Its application was protested by another telephone company enfranchised by the State in an adjoining area and already providing a similar radio service. The FCC declined to consider the question of the competitive impact of Souris River's proposed operation upon that of the protestant, noting that the Public Service Commission of North Dakota had been exercising jurisdiction over the radiotelephone operations of telephone companies in that state and that "the question of public interest and necessity for providing this service has been presumably determined favorably to Souris by the Public Service Commission of the State of North Dakota and we are bound to abide by its decision in that regard." The FCC carefully pointed out, however, that its ruling in this respect was limited to the facts of that particular case, and reiterated that "We make no determination now as to the situation where there is no local or State exercise of jurisdiction over the radio communication service."
This brings us, then, to the question of whether there has been an "exercise of jurisdiction over the radio communication service" in this state. As noted above, the Florida Commission had the view that RTC was "operating a telephone line * * * and is a telephone company under the laws of Florida." And it is true that, if we give to the words of the statute, Sec. 364.02, their literal meaning, it could conceivably be held that RTC's interconnection with Southeastern's telephone line constituted it a "telephone company", as defined in Sec. 364.02, as follows: 
"The term `telephone company,' * * includes every corporation * * * owning, operating or managing any telephone line or part of telephone line used in the conduct of the business of affording telephonic communication for hire within this state.
"The term `telephone line,' * * * includes * * * receivers, transmitters, instruments, machines, appliances, instrumentalities and all devices * * * used, operated, owned or controlled by any telephone company to facilitate the business of affording telephonic communication."
But it is our primary duty to give effect to the legislative intent; and if a literal interpretation leads to an unreasonable result, plainly at variance with the purpose of the legislation as a whole, we must examine the matter further.
In 1913, when the Florida Legislature enacted a comprehensive plan for the regulation of telegraph and telephone companies *581 in this state and conferred upon the Florida Public Utilities Commission (then known as the Railroad Commission of the State of Florida) authority to administer the Act and to prescribe rules and regulations appropriate to the exercise of the powers therein conferred, (Ch. 6525, Laws of Florida, Acts of 1913, now appearing as Ch. 364, Fla. Stat., F.S.A.), the science of radio broadcasting was just beginning to develop. In 1913 the Florida Legislature could not have envisioned  much less have intended to regulate and control  the radio communication services with which we are here concerned. This is, in fact, conceded by Southeastern in its brief (which was adopted by the Commission as representing its views) filed herein. But, they say, the Legislature has re-adopted Chapter 364 at each biennial session from 1943 through 1963, so that the Legislature could have intended to include such communications services when the Act was re-adopted. To so interpret the statute and the legislative intent would, in our opinion, be judicial legislating of the kind frequently condemned  that is, interpreting an existing statute or constitutional provision to encompass a situation obviously not within the purview of the legislative branch of the government or the people at the time of its enactment or adoption  as well as directly opposed to the policy of this state in its regulation of public utilities.
This is so, because the Legislature of Florida has never conferred upon the Florida Commission any general authority to regulate "public utilities." Throughout our history, each time a public service of this state is made subject to the regulatory power of the Commission, the Legislature has enacted a comprehensive plan of regulation and control and then conferred upon the Commission the authority to administer such plan. See, for example, Ch. 350, Fla. Stat., F.S.A. (Ch. 4700, Laws of 1899), regulating railroads and common carriers as therein defined; Ch. 366, Fla. Stat., F.S.A. (Ch. 26545, Laws of 1951) regulating gas and electric companies; Ch. 367, Fla. Stat., F.S.A. (Ch. 59-372, Laws of 1959), regulating water and sewer systems; and, of course, Ch. 364, Fla. Stat., F.S.A. (Ch. 6525, Laws of 1913), regulating telegraph and telephone companies.
We note, also, that, as late as 1953, the Legislature enacted Ch. 28013, Laws of 1953, (now Sections 364.32-364.40, Fla. Stat., F.S.A.) relating to the issuance of a certificate of convenience and necessity as a prerequisite to the operation of "any telephone line, plant or system, or any extension thereof", and observe that it would have been a simple matter to add thereto the words "or any radio-telephone system" or "radio communications service" if such had been the legislative intent.
We do not think that such was the legislative intent. It goes without saying that the radio communications services with which we are here concerned cannot be regulated by the same rule, mode or prescription applicable to telephone and telegraph companies. Even a casual reading of the pertinent portions of Part 21 of the Federal Rules and Regulations, regulating these services, will reveal that a whole new "language" has been developed to identify and characterize the various types of services included in the broad term "radio communications service." The problems to be resolved in granting or withholding permits or licenses are entirely different and require a considerable technical knowledge of the science of radio to solve them. See, for example, In re Application of Leslie F. Smith d/b/a Empire Communications Co., 30 F.C.C. 749; and Application of Telephone Answering Service of Trenton, 32 F.C.C. 842, both of which involved "comparative hearings" on "mutually exclusive applications".
Moreover, the limitations inherent in the use of radio channels as communications media  since there are only a limited number of such channels  would seem to require a different policy in granting or withholding licenses than that prescribed by our Legislature in Sec. 364.35(2), Fla. Stat., F. *582 S.A., relating to telephone companies  or, at least, the FCC has adopted a different policy. Thus, the FCC's policy is to grant the license or permit to the applicant who will use it "in such a way as to bring the maximum service to the maximum number of subscribers within the schedule of priorities provided for in Section 21.512 of the rules of the Commission", Application of Telephone Answering Service, supra, 32 F.C.C. 842. Thus, no preference is given by FCC to common carriers applying for such a license to expand their common carrier services. Ibid. See also Mackay Radio & Telegraph Co., Inc., 1960, 28 F.C.C. 231, in which the FCC declined to accept the argument of a protestant that it had "sufficient capacity to meet the present and foreseeable requirements" for the service for which the applicant desired a license, saying: "* * * if such an argument were accepted by the Commission, it would enable a present licensee to forestall any possible competition by providing itself with more capacity than necessary."
We are always reluctant to disagree with an administrative body in its interpretation of the statute which it has the duty to administer; and, of course, the orders of the Florida Commission come to this court with a presumption of regularity, Sec. 364.20, Fla. Stat., F.S.A. But we cannot apply such presumption to support the exercise of jurisdiction where none has been granted by the Legislature. If there is a reasonable doubt as to the lawful existence of a particular power that is being exercised, the further exercise of the power should be arrested. Edgerton v. International Company, Fla. 1956, 89 So.2d 488. See also State v. Western Union Telegraph Co., 1928, 96 Fla. 392, 118 So. 478.
In this case there can be no doubt what soever that the Legislature did not intend, in 1913, to regulate any type of radio service, including the "radiotelephone" service provided by Southeastern and RTC to their subscribers. And in view of the history of regulation of public utilities in this state by the Legislature, we have no doubt that, if and when the Florida Legislature decides to enter the field reserved to it in the Federal Communications Act of 1934, referred to above (Sec. 221(b), Title 47, U.S.C.A.), it will do so in no uncertain terms and in language appropriate to and by regulations suitable for this new type of communications service.
Accordingly, the order of the Florida Commission here reviewed, which was based solely on the proposition that RTC is a "telephone company" within the meaning of Chapter 364, Fla. Stat., F.S.A., must be held to be erroneous and should be quashed.
It is so ordered.
DREW, C.J., and O'CONNELL and CALDWELL, JJ., concur.
THOMAS, J., agrees in part and dissents in part with opinion.
THORNAL, J., dissents and agrees with THOMAS, J.
THOMAS, Justice (concurring in part and dissenting in part).
I agree with so much of the opinion as deals with the subject of pre-emption, but I disagree with that part holding the Florida Public Utilities Commission had no jurisdiction. So I would deny the petition for certiorari.
THORNAL, J., concurs.

ON REHEARING
PER CURIAM.
A rehearing having been granted in this cause and the case having been further considered upon the record, briefs and argument of counsel for the respective parties; it is thereupon ordered and adjudged by the Court that the original opinion heretofore filed in the above styled cause be and *583 it is hereby reaffirmed and adhered to on rehearing.
DREW, C.J., and ROBERTS, CALDWELL and HOBSON (Ret.), JJ., concur.
THOMAS, J., adheres to comment on original opinion.
THORNAL, J., agrees with THOMAS, J.
O'CONNELL, J., would grant and recede from original opinion.