580 So.2d 814 (1991)
Dennis CATRON, Appellant,
v.
ROGER BOHN, D.C., P.A., and Bohn Chiropractic Clinic, Appellees.
No. 90-00902.
District Court of Appeal of Florida, Second District.
May 15, 1991.
Rehearing Denied June 18, 1991.
Cary Alan Cliff of Faerber & Miller, Naples, for appellant.
Gerald W. Pierce of Henderson, Franklin, Starnes & Holt, P.A., Fort Myers, for appellees.
CAMPBELL, Judge.
Appellant, Dennis Catron, seeks reversal of the final summary judgment entered *815 against him in his action for medical negligence against appellees, Dr. Roger Bohn, a chiropractic physician, and Bohn Chiropractic Clinic. The trial judge found "that the record disclosed no competent, substantial evidence that Dr. Roger Bohn committed or omitted some act which violated the standard of care of reasonable chiropractic health care providers... ." We reverse.
In opposition to appellees' motion for summary judgment, appellant had submitted the affidavit of Dr. Michael D. Lusk, a board certified neurosurgeon, who examined and performed surgery upon appellant for the removal of spinal disc fragments subsequent to appellant's examination and treatment by appellee, Dr. Bohn. Appellees had submitted in support of their motion the affidavit of Dr. William R. Boritz, a doctor of chiropractic medicine. Dr. Boritz opined that "the care and examination afforded Dennis Catron by Roger Bohn, D.C., met and exceeded the standard of care for chiropractic within the Naples and similar communities in the State of Florida." Dr. Lusk, on the other hand, opined in substantial part as follows:
9. According to the medical records of Dr. Bohn, Dennis Catron presented to Dr. Bohn on July 14, 1987, with an oral history clearly indicative of cervical compression. The records of Dr. Bohn indicate that he took two (2) x-rays of Dennis Catron at that time.
10. The medical records of Dr. Bohn indicate that Dennis Catron presented himself to Dr. Bohn the following day, July 15, 1987, his condition now "advanced" and "worse symptomatically."
11. The medical records of Dr. Bohn for July 15, 1987, indicate on their face that Dr. Bohn performed treatment (the use of the word "treatment" appearing on the notes themselves as well as in response to Dennis Catron Interrogatory 6C of Dr. Bohn).
12. That the medical records of Dr. Bohn indicate that the patient was positive for LHermitte's Sign on July 15, 1987, which indicates spinal cord injury (spinal cord compression) in Dennis Catron.
13. That Dr. Bohn's medical records indicate that he also performed traction and distraction procedures on Dennis Catron during the same July 15, 1987, office visitation.
14. That, although I am familiar with Dr. Bohn's records of July 15, 1987, wherein he wrote of the possibility of referral for neurologic evaluation, his notes for the same day state "[patient] told to go home and stay still, no softball, scheduled appointment for Friday can't get in Thursday." This is indicative to me of a failure to immediately refer for neurological or neurosurgical examination and further indicative of an intent to continue chiropractic treatment.
15. That it is my considered medical opinion, within a reasonable degree of medical probability, that Dr. Roger Bohn, D.C. had sufficient medical history on July 14, 1987, which history was only further enhanced and "worse symptomatically" the following day, to clearly indicate the existence of serious cervical compression in Dennis Catron. That, with the indications so presented, Dr. Bohn should have discontinued further treatment or examination and immediately referred the patient for neurological or neurosurgical examination and treatment. Dr. Bohn's failure to cease examination and treatment in favor of immediate referral was a departure from the standard of care for physicians, including chiropractitioners, in Naples and similar communities in the State of Florida.
In order to have granted the summary judgment for appellees on the basis of a lack of competent substantial evidence in the record to support the allegation that Dr. Bohn violated the reasonable standard of care of chiropractic health care providers, the trial judge necessarily had to reject the affidavit of Dr. Lusk. The trial judge in the summary judgment does not specify the basis for his reasoning and neither do we have a transcript of the summary judgment hearing to illuminate his reasoning. We must conclude, however, from the arguments presented to us here that Dr. Lusk's affidavit was rejected because the trial judge concluded that under the terms *816 of section 766.102(2)(a), (b), and (c), Florida Statutes (Supp. 1988), Dr. Lusk was not qualified as an expert permitted to testify in a medical negligence action as a "similar health care provider" similar to Dr. Bohn's chiropractic specialty, nor did Dr. Lusk qualify as an expert that was "not a similar health provider" but permitted to testify because of the exception provided in section 766.102(2)(c)2.
We conclude under the facts of this case that Dr. Lusk's affidavit should have been considered and summary judgment for appellees thereby denied.
The facts, as we must accept them for the purpose of our review of the summary judgment for appellees, establish that on approximately July 14, 1987, appellant, Mr. Catron, consulted Dr. Bohn with complaints of pain and stiffness in his back, shoulders and neck. He was examined and treated by Dr. Bohn and scheduled for another appointment for July 15, 1987, when he was again examined and treated by Dr. Bohn. Dr. Bohn filed answers to interrogatories served on him by appellant that state as follows: (1) As to the nature of his examinations of Mr. Catron: "X-ray, orthopedic and neurological examinations."
(2) As to his description of his examination and treatment of Mr. Catron:
Description of examination is contained in office notes. Treatment consisted of trigger point therapy to the upper trapezius muscles for pain relief of muscle spasms. Energy point stimulation with a mild negative charge to same area. Blocked pelvis category III for pelvic stabilization. Approximately 4-6 oz. of sustained pressure posterior to anterior on C2 and 5. Additional orthopedic tests were performed at that time on the cervical spine to test for disc involvement and cord pressure. This procedure consisted of supine cervical distraction and compaction using light pressure with slight rotation.
(3) As to the conclusions he drew as a result of his evaluation and examination of Mr. Catron: "Following the first day's evaluation, a herniated disc was indicated in the cervical spine with associated radiculitis and myofascitis. Upon an extended examination on July 15, 1987 a possible ruptured disc with cord pressure was suspected, however, appeared inconsistent with case history as reported by the patient."
(4) As to the findings he made from each x-ray: "Widening of the intervertebral disc space, indicating disc protrusion at the posterior aspect of C4-5-6 on the lateral film."
(5) As to his prognosis and diagnosis of Mr. Catron: "Following the initial examination: Cervical disc syndrome, Cervical brachial symdrome [sic]. Upon additional evaluation on July 15, 1987: Possible disc rupture with associated cord pressure. Refer out for additional neurological evaluation."
(6) As to his advice to Mr. Catron: "Mr. Catron was informed of my findings following his first visit. However, I was unable to contact the patient following his second visit to be referred out for additional neurological testing by Dr. Bercaw because the patient did not have a phone at the time."
After Mr. Catron's second appointment with Dr. Bohn, Mr. Catron consulted another chiropractor who referred him to the emergency room at the hospital where he was admitted and subsequently operated on by Dr. Lusk. It is important to our resolution of this appeal to focus on the circumstances surrounding the alleged failure of Dr. Bohn to comply with the reasonable standard of care for chiropractors of the community. Dr. Bohn's own expert, Dr. Boritz, in his affidavit, bases his opinion that Dr. Bohn complied with the appropriate standard of care on the following statement: "Based upon a review of his records and the answers to interrogatories, it appears that Dr. Bohn correctly diagnosed a disc problem at C5/C6 and attempted to contact Mr. Catron by telephone in order to refer him to a neurologist for further work up." Dr. Lusk, on the other hand, in his opposing affidavit, bases his opinion of Dr. Bohn's failure to meet the appropriate standard of care on Dr. Bohn's failure to immediately refer Mr. Catron to *817 a neurologist and for Dr. Bohn to immediately cease treatment.
It appears to us that both Dr. Boritz and Dr. Lusk agree that the appropriate standard of care for a chiropractor in his treatment of Mr. Catron was not to subject Mr. Catron to any chiropractic manipulation or treatment but refer him immediately to a neurologist. Dr. Boritz in his affidavit does not refer to "treatment" by Dr. Bohn but only to "examination." However, even Dr. Bohn seems to admit that he did not ever actually refer Mr. Catron to a neurologist but only sought to contact him for the purposes of referral after examination and treatment. Even viewed in the light most favorable to Dr. Bohn, it is a disputed question of fact as to when and what treatment he gave to Mr. Catron and whether he timely or ever actually referred Mr. Catron to a neurologist.
Under those circumstances, it appears conclusively that Dr. Lusk's affidavit should have been considered pursuant to the provisions of section 766.102.
Two provisions of section 766.102 appear to mandate the consideration of Dr. Lusk's affidavit in this case. Subsection 766.102(1) requires that a person seeking damages based on death or personal injury resulting from the negligence of a health care provider must establish that health care provider's negligence based upon proof that the health care provider breached the prevailing standard of care that is recognized by reasonably prudent "similar health care providers" as acceptable and appropriate. Under section 766.102(2)(c)1, a "similar health care provider" may testify as an expert in such an action. The phrase "similar health care provider" is defined in subsection 766.102(2), which is comprised of paragraphs (a) and (b), and a concluding qualifying sentence. Paragraph (a) defines "similar health care provider" for those cases in which the allegedly negligent health care provider is not or does not hold himself out as a medical specialist (a "generalist"). Paragraph (b) applies to those cases in which the allegedly negligent health care provider is or does hold himself out to be a medical specialist (a "specialist"). Thus, the definition of medical specialist or specialty would appear critical.
At this point, it is appropriate for us to note that section 766.102 and many other sections of chapter 766 are appalling in their lack of definition of critical terms and in their total lack of consistency in the manner of use and apparent meaning of those numerous critical and undefined terms. For instance, "medical specialty" is nowhere defined in any applicable statutes. It is quite obvious that that term is used to apply to specialists in the whole spectrum of health care providers. Therefore, the use of the term "medical" without definition is inappropriate as many health care providers do not fall under any usual classification of "medical" health care providers. For instance, the term "health care providers" as defined in subsection 766.101(1)(b) includes many practitioners and groups who do not fit under a "medical" classification. Neither is "specialty," "specialist" or "discipline or school of practice" anywhere defined. In resort to a dictionary to find a definition of common usage, we find that The American Heritage Dictionary of the English Language 1240 (New College Edition 1979), defines "specialty" as: "1. A special pursuit, occupation, service, product, or the like. 2. An aspect of medicine to which physicians confine their practice after certification of special knowledge by examination... ." That dictionary also defines "specialize" as: "1. To train or employ oneself in a special study or activity... ." "Specialist" is defined as "1. a. One who has devoted himself to a particular branch of study or research. b. A physician certified to limit his practice to a specified field... ." The argument could thus be made that chapter 460, Florida Statutes (1987), which defines and regulates the practice of chiropractic, places a chiropractic physician in the category of a specialist as is contemplated by section 766.102(2)(b) when that section discusses those who practice in a "medical specialty." That would certainly appear to be a proper classification when a chiropractor is compared to a medical doctor limited to a general practice (commonly described in the *818 medical profession as a "G.P.") and normally only considered to be a "generalist" as defined under 766.102(2)(a).
Since we find, however, that the admission of Dr. Lusk's affidavit does not depend on whether Dr. Bohn may be considered a medical specialist, it is not necessary for us to determine that the legislature intended by its enactment of section 766.102(2)(b) to characterize the practice of chiropractic as a "medical specialty" as that term is used in subsection 766.102(2)(b). We conclude nevertheless that Dr. Lusk was a "similar health care provider" as contemplated by subsection 766.102(2). Subsection 766.102(2) concludes its provisions with this qualifying statement: "However, if any health care provider described in this paragraph is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a `similar health care provider.'" Under normal methods of statutory construction, we should conclude that that statement was meant to apply only to subsection 766.102(2)(b). The statement refers to "any health care provider described in this paragraph. ..." (Emphasis supplied.) It also speaks to the health care provider treating or diagnosing "for a condition not within his specialty. ..." (Emphasis supplied.) However, limiting that qualifying statement to subsection 766.102(2)(b) and not applying it also to subsection 766.102(2)(a), in our opinion, defies logic and leads to an unreasonable result. Under that interpretation, a specialist could only testify as an expert in cases against other specialists, either his specialty or others, and he could not testify regarding the prevailing professional standard of care for a general practitioner who is diagnosing or treating a condition that is within that specialist's specialty. We, therefore, interpret that statement to apply to all of subsection 766.102(2). Logic and reason mandates that when any health care provider is treating or diagnosing a patient for a condition, and the prevailing professional standard of care for that treating or diagnosing health care provider requires that he refer the patient for treatment or diagnosis to a specialist, then such a specialist should be considered in every such case a "similar health care provider" for the purpose of testifying as an expert.
It is our primary duty to give effect to legislative intent and, if a literal interpretation of a statute leads to unreasonable results, then we should exercise our power to interpret the statute in such a way as to impart reason and logic to it. Radio Tel. Communications, Inc. v. Southeastern Tel. Co., 170 So.2d 577, 580 (Fla. 1964). We believe our interpretation of this statute conforms to our duty. When legislative language is susceptible of more than one interpretation, we are required to adopt the interpretation that will avoid an unreasonable result. Foley v. State, 50 So.2d 179 (Fla. 1951); Gracie v. Deming, 213 So.2d 294 (Fla. 2d DCA 1968); Agrico Chem. Co. v. State Dep't of Envtl. Reg., 365 So.2d 759 (Fla. 1st DCA 1978), cert. denied, 376 So.2d 74 (Fla. 1979).
Unfortunately, it is apparent that in enacting this legislation, the legislature has, without redefining the terms for the purposes of this legislation, often used terms with commonly accepted meanings for purposes at great variance from those commonly accepted meanings. By doing so, the legislative intent in this legislation is often difficult to determine from the literal wording of the statute. In that context, it appears that the legislature has often made certain literal statements it did not mean using the commonly accepted meaning of the literal terms used and, to the contrary, has also often intended things it has not clearly said.
Following our interpretation then, if the appropriate standard of care for a chiropractor such as Dr. Bohn in his examination and treatment of Mr. Catron was that Mr. Catron should have been referred to a neurologist for further examination and treatment, then Dr. Lusk, as a neurologist, was, pursuant to that last quoted statement of section 766.102(2), a "similar health care provider." He was, therefore, qualified by section 766.102(2)(c)1 to testify as an expert in this case.
*819 Even if our conclusions based upon statutory interpretations so far are incorrect and Dr. Lusk is not a "similar health care provider" authorized by section 766.102(2)(c)1 to testify as an expert in an action against a chiropractor, he would certainly have been qualified to testify by section 766.102(2)(c)2. The pertinent sections of section 766.102(2)(c) provide:
(c) The purpose of this subsection is to establish a relative standard of care for various categories and classifications of health care providers. Any health care provider may testify as an expert in any action if he:
1. Is a similar health care provider pursuant to paragraph (a) or paragraph (b); or
2. Is not a similar health care provider pursuant to paragraph (a) or paragraph (b) but, to the satisfaction of the court, possesses sufficient training, experience, and knowledge as a result of practice or teaching in the specialty of the defendant or practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience, or knowledge must be as a result of the active involvement in the practice or teaching of medicine within the 5-year period before the incident giving rise to the claim. (Emphasis supplied.)
Both Dr. Boritz's affidavit and chapter 460 define the practice of chiropractic so as to clearly place it as a "related field of medicine" to neurology thereby qualifying Dr. Lusk to testify. Dr. Lusk, the treating neurologist to whom Mr. Catron was referred by another chiropractor, clearly met the other requirements of section 766.102(2)(c)2.
The summary judgment is reversed and this cause remanded for further proceedings consistent with this opinion.
DANAHY, A.C.J., concurs.
ALTENBERND, J., concurs specially.
ALTENBERND, Judge, concurring.
I concur in that portion of the majority's opinion which holds that, concerning the decision to refer a patient to a medical, neurological specialist and the details of when and how to perform such a referral, a board certified neurosurgeon is competent to provide relevant, expert testimony about the related field of chiropractic. See Van Sickle v. Allstate Ins. Co., 503 So.2d 1288 (Fla. 5th DCA 1987). Although there may be many legal issues concerning which the school of chiropractic and the medical specialty of neurosurgery are sufficiently distinct that an expert in one field could not testify about the standard of care owed by an expert in the other, I am convinced that the trial court abused its discretion by failing to consider the neurosurgeon's affidavit in the context of this case. Since Dr. Lusk's affidavit was competent evidence and created a disputed issue of fact, I concur in the reversal of the summary judgment.
I also agree that the legislature has not made our task easy by its choice of language in section 766.102, Florida Statutes (Supp. 1988).[1] In chapter 766, "medicine" *820 appears to include all "health care providers," and not merely those who practice "medicine" under chapter 458. Thus, I agree that a chiropractor who is licensed under chapter 460 may commit "medical negligence" for purposes of section 766.102, Florida Statutes (Supp. 1988).
To the extent that the majority's opinion suggests that an ordinary chiropractor may be a "specialist" for purposes of section 766.102(2)(b), Florida Statutes (Supp. 1988), I disagree. In the absence of statutory definitions, I believe that chiropractic is a "discipline" or "school of practice" and that a typical chiropractor is a generalist subject to the local standard of care defined in section 766.102(2)(a), Florida Statutes (Supp. 1988).[2] Although many chiropractors do not choose to specialize, there are recognized specialities within the chiropractic discipline or school of practice. Florida's Board of Chiropractic, for example, does not allow a chiropractor to advertise a specialty unless he or she has taken a minimum of 300 hours of postgraduate credit hours of training and has passed certain written and oral examinations. Fla. Admin. Code Rule 21D-15.001(2)(e). If chiropractic is a specialty, I do not know the "discipline" or "school of practice" in which it is a specialty.
My primary disagreement with the majority concerns its interpretation of the final sentence in section 766.102(2)(b), Florida Statutes (Supp. 1988). I believe that it applies only to true specialists. I do not agree that any compelling logic requires us to disregard the placement of that sentence and the rule of statutory construction which would limit its application only to section 766.102(2)(b). I believe that the majority's analysis results in placing a national, specialists' standard of care upon all general practitioners in any health care discipline if they are, as generalists, making a professional decision to refer a patient to a specialist. I do not believe that "logic and reason mandate" this result. Although Dr. Lusk's qualifications clearly allow him to testify as an expert in a "related field of medicine," the final sentence of section 766.102(2)(b) does not make these two physicians "similar health care providers."
The final sentence of that paragraph states: "However, if any health care provider described in this paragraph is providing treatment or diagnosis for a condition which is not within his specialty, a specialist *821 trained in the treatment or diagnosis for that condition shall be considered a `similar health care provider.'" This language was added to the statute in 1985. Ch. 85-175, § 10, Laws of Fla. I have not located any legislative history which reveals its intended purpose.[3]
Subsections (1) and (2) of section 766.102, Florida Statutes (Supp. 1988), perform at least two distinct, but interrelated, functions. They define a variable standard of care concerning the duty owed by a health care provider to a patient, and they explain the types of health care providers who are competent to provide expert testimony in such a lawsuit.
Subsection (1) establishes a burden on a plaintiff to prove that the health care provider breached a "prevailing professional standard of care" as determined in part under the standard of a "similar health care provider." Subsection (2) bifurcates the concept of "similar health care provider" into categories of generalists and specialists. The legislature created this division primarily to "establish a relative standard of care for various categories and classifications of health care providers." § 766.102(2)(c), Fla. Stat. (Supp. 1988). In essence, specialists are held to a higher, or at least more specialized, national standard of care while generalists are held to a less specialized, community standard.
The final sentence in section 766.102(2)(b) concerns a true specialist who elects to wander outside his or her area of specialty. One could argue that such a physician is merely a generalist in areas outside the specialty and should be subject to only the local standard of care. On the other hand, patients do not have the ability to understand the complex jurisdictional boundaries between health care specialties. If a patient goes to a specialist, he or she may fairly anticipate specialized care. To encourage specialists to limit their practice to their true specialties, I believe the legislature has inserted the final sentence in section 766.102(2)(b) to subject a specialist to the national standard of care in any field in which he or she opts to practice. Thus, if an internist actually practices in the field of cardiology, his or her practice in cardiology will be judged by the national standard applicable to cardiologists. Moreover, "similar health care providers" for purposes of testimony in a lawsuit against such an internist practicing as a cardiologist will be cardiologists rather than internists.
It is not my impression that Dr. Bohn was practicing outside the discipline of chiropractic. As a chiropractor, he did not attempt to provide medical, neurosurgical care. If he had attempted to practice medicine without a license, this lawsuit might be the least of his problems. See § 455.228, Fla. Stat. (1987). Within his discipline, he was making a professional decision to refer a patient to a specialist. That does not subject him to the neurosurgeon's standard of care, but it may, and in this case does, render the neurosurgeon a physician who "practice[s] ... in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine," i.e., chiropractic. § 766.102(c)(2), Fla. Stat. (Supp. 1988).
The majority's opinion states:
Logic and reason mandates that when any health care provider is treating or diagnosing a patient for a condition, and the prevailing professional standard of care for that treating or diagnosing health care provider requires that he refer the patient for treatment or diagnosis to a specialist, then such a specialist should be considered in every such case a *822 "similar health care provider" for the purpose of testifying as an expert.

(Original emphasis omitted; existing emphasis added.) I am inclined to agree that such a specialist will normally be a physician in a related field, so that the specialist may testify in such a case. But the concept of a "similar health care provider" also defines the defendant physician's standard of care. We cannot create one definition of "similar health care provider" for purposes of testimony and another for purposes of the standard of care. As a result, the majority's opinion will now subject all general practice medical doctors to the national standard of care owed by a specialist concerning the general practitioner's decision to refer a patient to the relevant specialist. I see no statutory or logical basis for this rule of law.
NOTES
[1] 766.102 Medical negligence; standards of recovery. 

(1) In any action for recovery of damages based on the death or personal injury of any person in which it is alleged that such death or injury resulted from the negligence of a health care provider as defined in s. 768.50(2)(b), the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.
(2)(a) If the health care provider whose negligence is claimed to have created the cause of action is not certified by the appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself out as a specialist, a "similar health care provider" is one who:
1. Is licensed by the appropriate regulatory agency of this state;
2. Is trained and experienced in the same discipline or school of practice; and
3. Practices in the same or similar medical community.
(b) If the health care provider whose negligence is claimed to have created the cause of action is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a "similar health care provider" is one who:
1. Is trained and experienced in the same specialty; and
2. Is certififed by the appropriate American board in the same specialty.
However, if any health care provider described in this paragraph is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a "similar health care provider."
(c) The purpose of this subsection is to establish a relative standard of care for various categories and classifications of health care providers. Any health care provider may testify as an expert in any action if he:
1. Is a similar health care provider pursuant to paragraph (a) or paragraph (b); or
2. Is not a similar health care provider pursuant to paragraph (a) or paragraph (b) but, to the satisfaction of the court, possesses sufficient training, experience, and knowledge as a result of practice or teaching in the specialty of the defendant or practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience, or knowledge must be as a result of the active involvement in the practice or teaching of medicine within the 5-year period before the incident giving rise to the claim.
[2] It is important to understand that the common law standard of care for health care providers was modified by the legislature in 1976 after substantial debate. Ch. 76-260, § 12, Laws of Fla. Whether physicians should be subject to a local or a national standard has been a topic of great conflict. See generally 70 C.J.S. § 65 Physicians and Surgeons (1987); 61 Am.Jur.2d §§ 218-20 Physicians, Surgeons, Etc. (1981). In 1976, the Florida Legislature resolved this conflict by continuing the local standard described in Brooks v. Serrano, 209 So.2d 279 (Fla. 4th DCA 1968), for general practitioners and by creating a national standard for specialists. See French, Florida Departs from Tradition: The Legislative Response to the Medical Malpractice Crisis, 6 Fla.St.U.L.Rev. 423, 438 (1978).
[3] The written legislative history is quite general in its description of this amendment. The House Committee on Health Care and Insurance Staff Analysis, dated April 8, 1985, describes this section in house bill 1352 as follows: "Standards for medical negligence are rewritten in terms of the prevailing professional norm." The House Subcommittee on Medical Malpractice Summary of the Major Provisions of house bill 1352 states: "Standard of care for medical negligence is redefined in a manner which specifically acknowledges changing trends and techniques for the delivery of health care in Florida and the sound discretion that is inherent in the diagnosis, care and treatment of patients by different health care providers." (Emphasis in original.)